UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 2:19-CR-00038-JRG-DHI |
| | ) | |
| CHADWICK WAYNE DUNFORD | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant's Motion to Suppress Evidence [Doc. 29] and the United States' Response [Doc. 32]. For the reasons herein, the Court will deny Defendant's motion.

## I. BACKGROUND

On October 30, 2018, Corporal Trevor Salyer, a local law enforcement officer with the Elizabethton Police Department, appeared before the Honorable Lisa Rice, a state criminal-court judge, with an affidavit in support of a search warrant for Defendant Chadwick Dunford's residence and vehicle. [Aff., Doc. 30, at 4]. In the affidavit, Corporal Salyer alleged that he had probable cause to believe that Mr. Dunford was currently, and unlawfully, in possession of firearms and ammunition, in violation of Tennessee Code Annotated § 39-17-1307. [*Id.*]. He noted that Mr. Dunford, in 2016, had been convicted of aggravated assault, a felony offense under Tennessee Code Annotated 39-13-102. [*Id.* at 5]. In addition, Corporal Salyer alleged that he had probable cause to believe that the firearms and ammunition were located in Mr. Dunford's residence and vehicle. [*Id.* at 4].

As support for his belief that Mr. Dunford was unlawfully in possession of firearms and ammunition, Corporal Salyer recounted various events involving Mr. Dunford. The first event dealt with a complaint that an individual made against Mr. Dunford for harassment on October

28, 2018,[1] and it prompted an officer in the Elizabethton Police Department to issue a "complaint slip for incident reporting" to Mr. Dunford. [*Id.* at 4–5]. The second event, which took place on October 29, 2018, stemmed from a visit that Mr. Dunford made to the Elizabethton Police Department, where he inquired about pressing charges against the same person who had filed a complaint against him. [*Id.* at 5]. When the clerk advised him of the cost associated with filing charges, he "got upset and said, 'I'll just take care of it myself. I was an Army Ranger . . . so I know how to handle it!'" [*Id.*]. Later in that same day, Mr. Dunford visited the local district attorney's office, where he met with an assistant district attorney and complained he had been robbed. [*Id.*]. When the assistant district attorney informed him that his complaint was not viable, he "became angry," and "he stated that he would have to handle things his way since no one would help him." [*Id.*].

On the following day, October 30, 2018, Mr. Dunford uploaded a post to his Facebook page, and, in part, it read:

> ONE DAY SOON THE CITIZENS ARE GOING TO GET FED UP WITH THE OVER AND THE ALSO PATHETICALLY UNDER POLICING AND THEY WILL RISE UP AND FIGHT AND RETALIATE BACK AGAINST ALL THE . . . ASSHOLE COPS . . . IT'S GONNA BE HELL BUT I CANNOT WAIT TO SHOW WHAT COMBAT VETERANS ARE CAPABLE OF WHEN THEY'VE BEEN PUSHED AROUND ENOUGH AND DECIDE TO PUSH, FIGHT AND SHOOT BACK[.] I FEAR NOTHING OR NO MAN BUT GOD, JESUS AND THE HOLY SPIRT . . . . WE ARE COMING AND YOU'LL NEVER SEE OR HEAR US COMING UNTIL IT'S WAY TOO LATE[.]

[*Id.* at 4].[2] Mr. Dunford also contemporaneously uploaded photos alongside this post, including a photo of himself during his time in the military, a photo of himself with firearms at a shooting

---

[1] According to Corporal Salyer, this individual claimed that Mr. Dunford had threatened to confront him at his workplace and to harm him and his family. [Aff. at 4].

[2] Mr. Dunford has not argued that he did not write this post, that he did not personally post it, or that the Facebook page did not belong to him.

2

range,[3] a photo of the Elizabethton Police Department's "complaint slip for incident reporting," and a photo of a "magazine fed rifle," a "drum fed rifle," a "pistol with a magazine seated in it," and a combat vest with magazine pouches attached to it. [*Id.* at 5]. A short while later, he uploaded a second Facebook post, in which he referred to "PUNKS HIDING BEHIND A BADGE AND GUN" and wrote that "THEIR TIME IS COMING SOON." [*Id.*].

According to Corporal Salyer, the photo of the firearms and ammunition "appeared to be taken in a residence," [*id.*], though he noted only that it was uploaded to Facebook in the early morning hours of October 30, 2018, and that a grocery basket was visible in the background of the photo.[4] Corporal Salyer, based on his training and professional experience, also asserted that rifles are "long guns" and "are extremely difficult to conceal on one's person." [*Id.* at 6]. He stated that, as a result, "it is common practice" for individuals to store these types of guns "within a residence or the trunk compartment of a vehicle." [*Id.*]. On October 30, 2018, Judge Rice, after reviewing the affidavit, approved a search warrant for the immediate search of Mr. Dunford's residence, vehicles, and outbuildings or parcels associated with his residence. [Search Warrant, Doc. 30, at 3].

Officers executed the search warrant on that same date, and they found in Mr. Dunford's residence a Glock 43, a 9mm Glock magazine, a high-capacity 9mm magazine, five .223 loaded magazines, three 12 gauge shotgun shells, a Silver Eagle 12 gauge shotgun, a 75 round capacity 7.62 drum, a tactical vest, an ammo can full of assorted ammunition, an ammo belt with assorted ammunition, three boxes of 9mm ammunition, three boxes of .223 ammunition, and two boxes

---

[3] According to Corporal Salyer, the shooting range was the "Pond Mountain gun range," a local shooting range. [*Id.* at 5].

[4] Corporal Salyer did not include the photo with his affidavit, and this Court has not viewed it.

of shotgun shells. [Evid. Recovery Log, Doc. 30, at 8–9].[5] In Mr. Dunford's vehicle, the officers found an AR-556 rifle, an AK-47 pistol, a .223 magazine, and a bandolier with shotgun shells. [*Id.* at 10]. On the day after the search, the United States charged Mr. Dunford with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). [Compl., Doc. 1; *see* Indictment, Doc. 12].

Mr. Dunford now moves to suppress all the evidence that the officers discovered during their search of his residence and his vehicle, contending that Corporal Salyer's affidavit "failed to establish probable cause to believe that evidence of a crime would be found at the places to be searched." [Def.'s Mot. Suppress at 3]. In response to his motion, the Court held a suppression hearing. The Court is now prepared to rule on Mr. Dunford's motion.

## II. LEGAL STANDARD

"[I]t undoubtedly is within [a federal court's] power to consider the question whether probable cause existed" to support the issuance of a search warrant. *United States v. Leon*, 468 U.S. 897, 905 (1984). When reviewing a search warrant for probable cause, the district court does not write on "a blank slate." *United States v. Tagg*, 886 F.3d 579, 586 (6th Cir. 2018). In other words, the district court does not engage in a de novo review, or "after-the-fact scrutiny," when considering whether the judicial officer who issued the search warrant had probable cause to do so. *Illinois v. Gates*, 462 U.S. 213, 236 (1983). Instead, the judicial officer "should be paid great deference" from the district court. *Id.* (quotation omitted). The United States carries the burden of establishing that the four corners of a search warrant support a finding of probable cause. *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006).

---

[5] The officers also discovered drugs—including marijuana and various pills—and digital scales in his residence. [Evid. Recovery Log at 7–8].

4

### III. ANALYSIS

"[A] state search warrant being challenged in a federal court must be judged by federal constitutional standards." *United States v. McManus*, 719 F.2d 1395, 1397 (6th Cir. 1983) (citing *Elkins v. United States*, 364 U.S. 206, 223–24 (1960)). The Fourth Amendment of the United States Constitution states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[6] The term "probable cause" is "defined as reasonable grounds for belief" of criminal activity, *Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010) (quotation omitted), or a "fair probability that contraband or evidence of a crime will be found in a particular place," *Gates*, 462 U.S. at 238.

To establish this fair probability, law enforcement officers have to sufficiently explain why they believe that they will find evidence of illegal activity in a particular place; in other words, they have to forge a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quotation omitted). Although probable cause requires more than the "mere suspicion" of criminal activity, *Sykes*, 625 F.3d at 306 (internal quotation mark and quotation omitted), it does not demand "an actual showing of such activity," *United States v. Moncivais*, 401 F.3d 751, 756 (6th Cir. 2005) (quotation omitted); *see Brinegar v. United States*, 338 U.S. 160, 175 (1949) ("In dealing with probable cause . . . as the very name implies, we deal with probabilities."). In short, "[p]robable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quotation omitted).

In its application, though, probable cause is something of a protean concept—that is, it is "not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232; *see*

---

[6] The Fourth Amendment applies to the states through the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207 (1979).

*Adams v. Williams*, 407 U.S. 143, 147 (1972) ("One simple rule will not cover every situation."); *see also Florida v. Harris*, 568 U.S. 237, 243–44 (2013) (stating that the "test for probable cause is not reducible to 'precise definition or quantification'" (quotation omitted)). Instead, probable cause is "a fluid concept." *Gates*, 462 U.S. at 232; *see Harris*, 568 U.S. at 244 (stating that "[a]ll we have required is the kind of 'fair probability' on which 'reasonable and prudent [people], not legal technicians, act," without resorting to "rigid rules, bright-line tests, and mechanistic inquiries" (quotations omitted)). When deciding whether probable cause supports an affidavit for a search warrant, courts therefore may, and often do, rely on "common-sense conclusions about human behavior." *Gates*, 462 U.S. at 231; *see Harris*, 568 U.S. at 244 (describing a "practical and common-sensical standard" for probable cause).

But in forming these common-sense conclusions, courts have a legal obligation to draw them from the totality of the circumstances, or in other words, from all the allegations in the affidavit—not viewing these allegations in piecemeal fashion but viewing them as one, organic whole. *See Gates*, 462 U.S. at 238 (adopting a totality-of-the-circumstances analysis that applies to probable-cause determinations); *Tagg*, 886 F.3d at 586 ("Facts must be considered *together*, not apart, since 'the whole is often greater than the sum of its parts.'" (quoting *Wesby*, 138 S. Ct. at 588)). And, importantly, courts must confine themselves to the four corners of the affidavit, not looking to any evidence or information outside the affidavit. *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009).

### A. Probable Cause

Mr. Dunford, in arguing that the affidavit is without probable cause for Corporal Salyer's belief that firearms and ammunition were present in his residence and vehicle, focuses on the requisite "nexus between the place to be searched and the evidence sought." *Carpenter*, 360 F.3d

at 594 (quotation omitted). He contends that the affidavit lacks factual assertions linking his residence or vehicle to firearms and ammunition. [Def.'s Mot. Suppress at 4, 6]. Specifically, he maintains that "[t]he affidavit does not detail any facts as to why Corporal Salyer made the leap that firearms would be found at Mr. Dunford's residence or vehicles, simply because Mr. Dunford made negative expressions towards local law enforcement." [*Id.* at 4]. To support his argument, he dissects, or in his words, "pars[es] out paragraph by paragraph," Corporal Salyer's statements in the affidavit, explaining why each paragraph is factually insufficient to establish the requisite nexus. [*Id.* at 6–8]. Mr. Dunford places specific scrutiny on the fact that his Facebook photo of the firearms and ammunition and his Facebook photo at the shooting range are undated, and therefore could have been taken before his felony conviction in 2016. [Def.'s Mot. Suppress at 5, 6; Hr'g Tr. at 10:55:51–10:56:23; 10:59:59–11:00:17 (on file with the Court)]. Mr. Dunford also places scrutiny on the fact that the affidavit lacks information from which anyone could discern that he took the photo of the firearms and ammunition in his residence, rather than, say, in a relative's residence. [Hr'g Tr. at 10:59:50].

In response, the United States argues that the affidavit contains probable cause, "through the common sense lens of the totality of [the] circumstances." [United States' Resp. at 3]. In particular, the United States highlights Mr. Dunford's Facebook post, in which he used the language "shoot back," and the photo of the firearms and ammunition alongside that post. [*Id.* at 4–5]. The United States also stresses Corporal Salyer's statement that this photo "appeared to be taken in a residence." [*Id.* at 5]. In addition, the United States maintains that Mr. Dunford, by "deconstructing the affidavit," is "conducting the very hyper technical line by line scrutiny that's expressly forbidden both by the United States Supreme Court . . . as well as this circuit." [Hr'g Tr. at 10:41:47–10:41:58].

7

*1. The Search of Mr. Dunford's Residence*

The Court begins with the method behind Mr. Dunford's argument—his "paragraph by paragraph" dissection of the affidavit. [Def.'s Mot. Suppress at 6]. By picking apart the affidavit in this way, he does indeed, as the United States points out, pitch an argument that is mutually incompatible with the totality-of-the-circumstances test. *See Wesby*, 138 S. Ct. at 588 (observing that "the totality-of-the-circumstances test 'precludes this sort of divide-and-conquer analysis'" (quotation omitted)); *United States v. Woolsey*, 361 F.3d 924, 926 (6th Cir. 2004) ("[T]he court should consider whether the totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny." (citation omitted)); *Tagg*, 886 F.3d at 586 ("Facts must be considered *together*, not apart, since 'the whole is often greater than the sum of its parts.'" (quoting *Wesby*, 138 S. Ct. at 588)). In fact, Mr. Dunford's reliance on a paragraph-by-paragraph shakedown of the affidavit is by itself a basis for denial of his motion. *See Wesby*, 138 S. Ct. at 588–89 (reversing the circuit court partly because it examined a case in this way); *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (recognizing that the approach of viewing portions of an affidavit in isolation is "explicitly forbidden" (citing *Gates*, 462 U.S. at 235–36)); *Tagg*, 886 F.3d at 585–86 ("[J]udges are not permitted to engage in 'an excessively technical dissection' of the record when determining probable cause." (quoting *Wesby*, 138 S. Ct. at 588)).

One of the shortcomings inherent in this divide-and-conquer approach is a defendant's propensity to "focus[] on what the affidavit does *not* contain, or the flaws of each individual component of the affidavit," without sufficient regard for "what the affidavit *does* show." *Christian*, 925 F.3d at 312 (emphasis added). This very shortcoming plagues Mr. Dunford's argument. For example, in engaging in a one-sided analysis of the affidavit's individual flaws,

he omits any mention of Corporal Salyer's assertion that long-gun owners usually "store such firearms within a residence or the trunk compartment of a vehicle." [Aff. at 6]. An assertion like this one—based on a law enforcement officer's training and experience—carries substantial heft in an affidavit and, therefore, ought to be part of any totality-of-the-circumstances analysis. *See United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) ("[C]ourts may afford 'considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found[.]" (quotation omitted)).

In a demonstration of how to examine the full contents of an affidavit rather than sift it for flaws, the Sixth Circuit has, on more than one occasion, begun its analysis of probable cause by reciting the assertions in the affidavit. *See Christian*, 925 F.3d at 308 (listing the "information in support of [the] belief that there was probable cause to search [the defendant's] home" as a primer to its analysis of probable cause); *Tagg*, 886 F.3d at 584 (enumerating the "pieces of data" in the affidavit before performing its analysis of probable cause); *see also United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) ("[An] affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added."). In this case, Corporal Salyer's grounds for probable cause in his affidavit include: (1) Mr. Dunford's Facebook posts, namely his remarks that he could not wait to "retaliate" and "shoot back" against law enforcement officers and "their time is coming soon"; (2) his photo of a cache of firearms and ammunition, uploaded alongside his threatening Facebook posts; (3) his photo of himself in possession of firearms at a local shooting range; (4) Corporal Salyer's belief that Mr. Dunford appeared to upload his photo of firearms and ammunition from a residence; and (5) Corporal Salyer's belief that these firearms likely were present in Mr. Dunford's residence and/or vehicle

9

because, based on his training and experience, long-gun owners customarily store these types of weapons in these places. [Aff. at 4–6].

While the Court is mindful that a person's residence is a place of sanctity under Fourth Amendment jurisprudence—because people have an unparalleled expectation of privacy in their homes, *Payton v. New York*, 445 U.S. 573, 589–90 (1980)—Corporal Salyer's assertions, in their totality and from a common-sense perspective, establish probable cause for the search of Mr. Dunford's residence and vehicle. Several courts, including the Sixth Circuit, have held that probable cause exists to search a suspect's residence for a firearm based on little more than an inference that the residence is the most likely place for the firearm. *See Peffer v. Stephens*, 880 F.3d 256, 271 (6th Cir. 2018); *United States v. Goodwin*, 552 F. App'x 541, 546 (6th Cir. 2014); *United States v. Vanderweele*, 545 F. App'x 465, 467 (6th Cir. 2013); *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988); *United States v. Shomo*, 786 F.2d 981, 984 (10th Cir. 1986); *United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975); *United States v. Ingram*, No. CR.A. 02-10360-RWZ, 2003 WL 21058181, at *2 (D. Mass May 9, 2003); *see generally United States v. Hawkins*, 278 F. App'x 629, 634 (6th Cir. 2008) ("[The] nexus may be established by the nature of the items and normal inferences of where a person would keep such items." (citing *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005); *United States v. Rosenbarger*, 536 F.2d 715, 719 (6th Cir. 1976))). Indeed, the Sixth Circuit "ha[s] acknowledged that individuals who own guns keep them at their homes," and that, therefore, "a suspect's use of a gun in the commission of a crime is sufficient to find a nexus between the gun that was used and the suspect's residence." *Peffer*, 880 F.3d at 271 (internal quotation omitted).

In Mr. Dunford's case, Corporal Salyer sought to establish probable cause for illegal possession of a firearm under Tennessee Code Annotated § 39-17-1307—a possessory crime,

which, like any other crime involving a firearm, supports the common-sense inference that Mr. Dunford stored the firearms in his residence. *United States v. Smith*, 182 F.3d 473, 480–81 (6th Cir. 1999).[7] When the Court views this common-sense inference through the prism of the totality of the circumstances—that is, in tandem with Mr. Dunford's post about "shoot[ing] back" against law enforcement officers, Mr. Dunford's photo of himself in possession of firearms at a local shooting range, Mr. Dunford's photo of an arsenal of firearms and ammunition, and Corporal Salyer's belief that "it is common practice" for gun owners to keep long guns in their residence or vehicle—the affidavit unequivocally supports a finding of probable cause. *See Vanderweele*, 545 F. App'x at 469 (holding that a nexus existed to link a silencer to the suspect's residence based on nothing more than (1) information that the suspect had been seen with it and (2) the affiant's statement, from his training and experience, that owners of firearms and related items commonly keep them in their homes); *see also Peffer*, 880 F.3d at 271 (discussing *Vanderweele* with approval, in a published opinion); *cf. Smith*, 182 F.3d at 481 ("Defendant's position, essentially, is that unless the police conducted surveillance and saw defendant with a gun, there would be insufficient corroboration. We emphatically disagree.").

---

[7] Under Tennessee Code Annotated § 39-17-1307(a)(1)–(c)(1), a person commits a criminal offense when he (1) "carries, with the intent to go armed, a firearm or a club," (2) "unlawfully possesses a firearm" and "[h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon," or (3) "possesses a handgun and has been convicted of a felony." Although Corporal Salyer, in his affidavit, did not specify which of these three crimes was the focus of his attention, he did state that Mr. Dunford's "criminal history shows that he is a felon convicted of TCA 39-13-102 Aggravated Assault," suggesting that he believed the crime at issue was Mr. Dunford's illegal possession of firearms as a convicted felon. [Aff. at 5].

Corporal Salyer had no legal obligation to add further specificity to his affidavit; his indication that the crime at issue was possessory in nature is enough to justify a finding of probable cause. *See United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991) ("[K]nowledge of the precise crime committed is not necessary to a finding of probable cause provided that probable cause exists showing that a crime was committed by the defendants."); *Allen*, 211 F.3d at 974 ("[A]n affidavit need only provide probable cause to believe a search will uncover evidence of some wrongdoing, without need for further specificity." (citing *Anderson*, 211 F.2d at 457)); *see also Adams v. Williams*, 407 U.S. 143, 149 (1972) ("Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." (citation omitted)).

Although Mr. Dunford contends that his undated photo of himself at the shooting range does not "show anything other than his possession [of firearms] at some point in time," which, he argues, could have occurred before his felony conviction, he does not specifically invoke—beyond this general assertion—the doctrine of staleness. [Def.'s Mot. Suppress at 5]. "Staleness" refers to the precept that probable cause "is concerned with facts relating to a presently existing condition," *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (quotation omitted), and akin to the totality-of-the-circumstances test, "[t]he staleness inquiry is tailored to the specific circumstances in each case," *Goodwin*, 552 F. App'x at 544 (citing *Abboud*, 438 F.3d at 572). "The critical question," in consideration of staleness, "is whether the information contained in the affidavit, when presented to the . . . judge, established that there was a fair probability that [evidence] would still be found at [the location of the search]." *Abboud*, 438 F.3d at 572 (quotation omitted).

The length of time between the occurrence of the events alleged in an affidavit and the application for a search warrant, however, "is not controlling," *Spikes*, 158 F.3d at 923—especially when the crime involves a firearm, *see United States v. Lancaster*, 145 F. App'x 508, 513 (6th Cir. 2005) (holding that information pertaining to a suspect's possession of a machine gun, even though it predated the affidavit by more than two years, was not stale); *see also United States v. Piloto*, 562 F. App'x 907, 913 (11th Cir. 2014) ("Unlawful possession of a firearm is an ongoing crime, so 'old' information is relevant to the question of present probable cause."); *see generally Abboud*, 438 F.3d at 572 ("It is possible that even if a substantial amount of time had elapsed between 'a defendant's last reported criminal activity' and the issuance of the warrant, the warrant had not become stale." (citation omitted)).

A proper analysis of staleness, therefore, cannot rest exclusively on the age of the information supporting an affidavit's allegations, *Spikes*, 185 F.3d at 923, but must consist of an examination of four factors: (1) "the character of the crime (chance encounter in the night or regenerating conspiracy?)"; (2) "the criminal (nomadic or entrenched?)"; (3) "the thing to be seized (perishable and easily transferable or of enduring utility to its holder?)"; and (4) "the place to be searched (mere criminal forum of convenience or secure operational base?)." *Christian*, 925 F.3d at 324 (quotation omitted). Mr. Dunford's failure to mention these four factors, let alone perform an analysis under them, is by itself fatal to his argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quotation omitted)); E.D. Tenn. L.R. 7.1(b) ("Briefs shall include. . . [the] legal grounds which justify the ruling sought from the Court.").

But even if Mr. Dunford had addressed these four factors, the Court would not accept a staleness argument because, despite the lack of dates on the Facebook photos, the totality of the circumstances establishes "a fair probability that [the firearms and ammunition] would still be found" in his residence and vehicle. *Abboud*, 438 F.3d at 572 (quotation omitted). Again, "[t]he staleness inquiry is tailored to the specific circumstances in each case." *Goodwin*, 552 F. App'x at 544 (citing *Abboud*, 438 F.3d at 572). According to Corporal Salyer's affidavit, Mr. Dunford's photo of the firearms and ammunition were attached to, or uploaded with, his Facebook posts containing his threat to "shoot back" against law enforcement officers, [Aff. at 5], creating temporal proximity between the two. From a common-sense perspective, the temporal proximity between his threat and his photo can mean only one thing: he had the *present* ability to carry out

the acts of violence that he referred to. *See Gates*, 462 U.S. at 231 (highlighting the "common-sense conclusions about human behavior" that are integral to an analysis of probable cause); *see also Harris*, 568 U.S. at 244 (describing a "practical and common-sensical standard" underlying the analysis of probable cause). Simply, the totality of the circumstances, commingled with even a small dose of common sense, does not sustain the argument that Mr. Dunford's photos of the firearms were a throwback to a distant time and place.

Lastly, the Court would be remiss if it did not mention that none of the cases that Mr. Dunford cites in support of his cause has anything to do with firearms. During the hearing, Mr. Dunford placed particular emphasis on *United States v. Carpenter*, 360 F.3d 591 (6th Cir. 2004), which he described as "seminal for the Court to look at." [Hr'g Tr. at 10:48:50–10:48:56]. But *Carpenter* dealt with the offense of marijuana manufacturing, not the illegal possession of firearms. The distinction is an important one because the specific type of offense in question is hardly incidental to an analysis of probable cause. *See United States v. Sneed*, 385 F. App'x 551, 556 (6th Cir. 2010) ("[A] nexus can be inferred based on the nature of the evidence sought and *the type of offense* that the defendant is suspected of having committed." (emphasis added) (citations omitted)); *see also Tagg*, 886 F.3d at 586 (describing the "unique challenges of child-pornography crimes" in the context of "the probable-cause question" (citation omitted)); *United States v. Brown*, 828 F.3d 375, 383–84 (6th Cir. 2016) (discussing the Sixth Circuit's specific line of jurisprudence concerning drug dealers and findings of probable cause). In sum, the four corners of Corporal Salyer's affidavit, based on the totality of the circumstances, easily support the United States' position that probable cause existed for the search of Mr. Dunford's residence.

*2. The Search of Mr. Dunford's Vehicle*

As is the case with Mr. Dunford's residence, the affidavit establishes probable cause for the search of his vehicle, under the totality of the circumstances. To begin with, Mr. Dunford's possession of firearms at the shooting range enables the Court arrive at the common-sense inference that he used his vehicle to transport the firearms and ammunition from his residence to the range, and even to store these items. *Cf. United States v. Morris*, CR 117-039, 2017 WL 5180970, at *4 (S.D. Ga. Oct. 19, 2017) ("[C]ommon sense dictates that hunters keep hunting devices and quarry in their vehicles and homes, and felons in possession of firearms often store them in the same locations."); *United States v. Tisdale*, 70 F. Supp. 2d 1210, 1215 (D. Kan. 1999) ("Common sense suggests that if the defendant had such items with him before the shooting, they had been kept either in his house or in his car.").

When the Court considers his possession of firearms at the range, the common-sense nexus between the firearms and his vehicle as a method of transportation to and from the range, the temporal proximity between his threats and his photo of the firearms, and Corporal Salyer's belief—from his training and experience—that the firearms likely were present in his vehicle, the affidavit is undoubtedly imbued with probable cause. *Compare Vanderweele*, 545 F. App'x at 469 (holding that a nexus existed to link a silencer to the suspect's residence based on nothing more than (1) information that the suspect had been seen with it and (2) the affiant's statement, based on his training and experience, that owners of firearms and related items commonly keep them in their homes), *with Arizona v. Gant*, 556 U.S. 332, 345 (2009) (recognizing that, under the Fourth Amendment, an individual's "privacy interest in his vehicle [is] less substantial than in his home" (citation omitted)); *see Williams*, 544 F.3d at 686 (granting "considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime

is likely to be found" (quotation omitted)). In short, the affidavit supports a "fair probability" that the firearms were present in Mr. Dunford's vehicle, *Gates*, 462 U.S. at 238, and nothing more is necessary for a finding of probable cause, *Wesby*, 138 S. Ct. at 586 ("Probable cause 'is not a high bar.'" (quotation omitted)).

## IV.  CONCLUSION

The United States satisfies its burden of showing that Corporal Salyer's affidavit, under the totality of the circumstances, establishes probable cause for the search of Mr. Dunford's residence and vehicle. Mr. Dunford's Motion to Suppress Evidence [Doc. 29] is therefore **DENIED**. The plea deadline is October 31, 2019, and the trial date is November 14, 2019.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
